SHIRLEY AFFATATO, Plaintiff-Appellant, v. JEWEL COMPANIES, INC., *et al.*, Defendants-Appellees.

First District (2nd Division)    No. 1—91—1402

Opinion filed March 22, 1994.

Holstein, Mack & Klein, of Chicago (David L. Poindexter, of counsel), for appellant.

Pope, Cahill & Devine, of Chicago (Richard A. Devine, Francis A. Citera, and Patricia McMahon, of counsel), for appellee Jewel Companies, Inc.

Susan S. Sher, Corporation Counsel, of Chicago (Lawrence Rosenthal, Benna Ruth Solomon, and Bobbie McGee Gregg, Assistant Corporation Counsel, of counsel), for appellee City of Chicago.

JUSTICE McCORMICK delivered the opinion of the court:

Plaintiff, Shirley Affatato, sued Jewel Companies, Inc., for selling milk contaminated with salmonella which caused her husband, Anthony Affatato, to suffer salmonellosis before his death, and which caused his death. Jewel conceded liability for suffering before death but argued that the salmonella did not cause death. Plaintiff appeals from the judgment entered on the jury's verdict for Jewel on wrongful death and from the amount awarded plaintiff for Anthony's suffering before death.

We find that the verdict in favor of Jewel on the wrongful death claim is neither contrary to the manifest weight of the evidence nor inconsistent with the verdict against other defendants. The trial court committed no reversible error in its rulings on the evidence. Therefore, in part I of the opinion, we affirm the judgment for Jewel in the wrongful death action and the judgment for plaintiff on the claim for Anthony's suffering before death.

Plaintiff also sued the City of Chicago (the City) for responding to her 911 call too late to prevent Anthony's death. Plaintiff appeals from the trial court's decision granting the City summary judgment. We find that plaintiff failed to present evidence which could support a finding that the City committed willful and wanton misconduct, and therefore in part II of the opinion we affirm the decision granting the City summary judgment.

I

In early April 1985 Anthony Affatato drank some milk plaintiff purchased from a Jewel food store. On April 14 Anthony had severe stomach pains and that night he began vomiting. He had diarrhea and a fever of 103 degrees. On April 16, 1985, plaintiff called Anthony's doctor, Dr. Oscar Osimani, who told her to take Anthony to the emergency room at Resurrection Hospital. Tests done at the hospital showed that Anthony had contracted salmonellosis. On April 19 plaintiff and Anthony began keeping a diary in which they described Anthony's symptoms and the course of his illness.

When Anthony's condition had not improved by April 23, plaintiff went to Dr. Osimani's office to schedule an appointment. At that appointment, on May 7, Dr. Osimani found that Anthony continued

to suffer from salmonellosis. Anthony went to see Dr. Osimani again on May 21, complaining of rectal pain. Dr. Osimani treated Anthony's hemorrhoids, and he noted that Anthony continued to experience symptoms of salmonellosis, including diarrhea, which may have caused the hemorrhoids.

On June 2, 1985, along with the continuing symptoms of salmonellosis, Anthony had chest pains and he vomited with great force. Plaintiff took him to the emergency room at Resurrection Hospital, where Dr. Tighe Zimmers examined him. He ordered an electrocardiogram (EKG) for Anthony. After he got the results he called Dr. Osimani to tell him of the symptoms. Dr. Zimmers diagnosed Anthony's condition as "Non-cardiac Chest Pain, Secondary to Gas." Dr. Zimmers recommended no hospitalization. He did not have the authority to admit patients to the hospital, but Dr. Osimani could. Dr. Zimmers gave Anthony medicine for indigestion and discharged him from the emergency room. The hospital sent Dr. Osimani the EKG on June 3. Dr. Osimani did not attempt to contact Anthony.

Anthony had some chest pain for several days during the following week. After a particularly bad night on June 9, plaintiff called Dr. Osimani early on the morning of June 10, 1985. Dr. Osimani told her to bring Anthony to the outpatient department of Resurrection Hospital at 11:30 that morning. Plaintiff went to work, planning to come home at 11 a.m. She took their daughter to nursery school, leaving Anthony with their 10-year-old son. Her son called her at work to tell her that he could not wake Anthony. By the time they were able to get Anthony to the hospital, he had died of a heart attack.

Plaintiff, in her capacities as executor of Anthony's estate, as next friend of her children, and on her own behalf, sued Jewel Companies, Inc., Dr. Osimani, Dr. Zimmers and Resurrection Hospital.

At trial, plaintiff used the diary to refresh her memory concerning the course of Anthony's illness. She said he had diarrhea which kept him up at night and caused him to go to the bathroom 10 times an hour for more than a week. He ate very little and drank only eight ounces of Gatorade each day. By early May his diarrhea let up so that he was going to the bathroom 30 times a day, but he still could not eat or drink much. Diarrhea continued throughout his illness, causing him to go to the bathroom at least 10 times a day.

The trial court did not allow the diary itself into evidence, and the court disallowed reference to several particular entries, including parts of the entries for April 26, May 4, 7, 13 and 28, and June 2, 3

and 8. In those entries, Anthony reported: "I feel so sick yet they say there is nothing they can do for me"; "Can't believe I'll ever get better, but doctor says it just takes time—so hang in there"; "Doctor *** explained that it might be awhile before I get better"; and "I'll keep doing what they say so I can get better."

Plaintiff most strenuously objected to exclusion of entries for May 28 and thereafter. Anthony there said:

> "Put a call in[ ]to my Doctor. He called back and I told him about pains, he said it could be very bad indigestion—try 2 Maalox 1 hour after each meal. And then 2 more at bedtime.
>
> If it does not get better, I'm suppose[d] to go see him at the Outpatient department at hospital."

After his emergency room visit, Anthony recorded that Dr. Zimmers told him, if his chest pain

> "persists, follow up with doctor. *** Doctor said medicine would not take all the chest pain away. It would just relieve some of it and make the pains not so bad."

For the next day, he said he was "Trying to eat 7 or 8 times a day instead of 3 times a day, doctor said it will help the throwing up." On June 8, Anthony told plaintiff to write:

> "Really feel bad today. Shirley's mad because I don't complain how bad I feel, but every time I tell the doctor how I feel he says I know, I know. Never seems to do anything when I tell him how I feel."

Plaintiff subpoenaed Dr. Michael Chambliss, who performed the autopsy, to testify at trial. He appeared in court on the date the parties arranged, during plaintiff's case in chief. Plaintiff decided to forego calling Dr. Chambliss. Defense counsel pointed out that that date was "his window of opportunity [for] coming to testify *** and we did work out a time." Plaintiff released Dr. Chambliss from the subpoena.

Dr. Meryl Haber, plaintiff's expert, explained his theory of how Anthony came to have a heart attack:

> "[G]iven the fact that he had diarrhea, [Anthony] had to be losing fluids from the gastrointestinal tract which would produce a lowered blood volume, less fluid in the circulatory system, which would then be a stressful situation and impact on the ability of the heart to function normally.
> ***
> Because of the decreased blood volume, the heart has to get blood around the body to keep the organs alive.
>
> To do this, it has to pump *** much harder to get the same amount of oxygenating capacity to the various organs. And that puts stress upon the heart."

Dr. Haber, who attended the autopsy, said that the enlarged heart found at the autopsy showed that it had undergone such stress. The heart suffered the fatal infarction at least four days prior to death. The small intestines still were inflamed, possibly as a result of the salmonellosis. A culture taken at autopsy showed the continued presence of active salmonella in Anthony's system. Dr. Haber admitted that the enlarged heart could have been the result of Anthony's emphysema or the arteriosclerosis which partially blocked one of Anthony's coronary arteries, but in his opinion salmonellosis was the most likely cause of the heart enlargement.

Dr. James Talano corroborated Dr. Haber's opinion:

"[A]s a result of the Salmonella, there is excessive loss of body fluids because of the number of episodes of diarrhea.

And because of that, there is general dehydration from the patient. ***

\* \* \*

*** They have a drop, alteration in *** the blood pressure within the heart.

They also have alterations within *** coronary blood flow, which means that blood flow[s] in the coronary arteries are less.

The blood *** becomes thicker. And many times, they will have occlusion of a vessel temporarily during this process. ***

*** [T]hat can be called coronary spasm ***.

\* \* \*

[Anthony] developed Salmonellosis and had an excessive number of bowel movements. As a result of that, he became extremely dehydrated ***.

It was the loss of volume as well as the loss of electrolytes within his system that caused him to be in a debilitated state. *** And as a result of that, he *** died."

Dr. Talano opined that Dr. Osimani and Dr. Zimmers should have done more and better tests to determine whether Anthony was dehydrated, and they should have given him fluids intravenously. Dr. Talano also said that the doctors on June 2 deviated from the standard of care by releasing Anthony from the hospital without further testing his heart, after Anthony came to the emergency room complaining of chest pains and after they received the abnormal EKG which showed possible ischemia.

Plaintiff called Dr. Osimani as an adverse witness. Dr. Osimani admitted that he read the autopsy report, and he agreed with Dr. Chambliss' findings that a heart attack caused Anthony's death and "[s]almonella gastroenteritis due to ingestion of contaminated milk was a significant contributing factor to his death." Dr. Osimani

testified that Anthony appeared to be adequately hydrated both on May 7 and on May 21 when Dr. Osimani examined him.

When plaintiff was nearly finished presenting witnesses, the court said in a sidebar:

> "I am stating to the attorneys and to the record that there is no restriction for the admission or the submission of exhibits ***.
>
> It can be done any time prior to closing arguments ***. And so if there is any reason there should be a deviation from that, it will have to be brought to the judge's attention."

Plaintiff then rested without offering exhibits.

Defense experts, Dr. Larry Goodman and Dr. William Buckingham, testified that, according to medical records, Anthony was adequately hydrated after April 16, 1985. Both experts noted that his blood pressure was high—one would expect a dehydrated patient to have low blood pressure—and his pulse was not as high as one would expect if his blood volume were low from dehydration. Dr. Goodman concluded: "I do not believe that the salmonella infection contributed significantly to that myocardial infarction" which killed Anthony. Defense experts also testified that Anthony's eating and smoking habits contributed to his suffering and death. The experts said Anthony should have seen his doctor more frequently for the symptoms he recorded in his diary, and, in particular, he should have seen his personal physician again when his chest pains persisted after his emergency room visit on June 2.

After defendants rested plaintiff sought to introduce as her final exhibit the records of Dr. Chambliss' autopsy. The death certificate Dr. Chambliss prepared listed "salmonella gastroenteritis due to ingestion of contaminated milk" as a significant contributing factor for the death. In the report of the post-mortem examination Dr. Chambliss again stated: "Salmonella gastroenteritis due to ingestion of contaminated milk was felt to be a significant contributing factor to" Anthony's death. Defendants protested that they would have no opportunity to cross-examine Dr. Chambliss concerning the documents. Plaintiff offered the documents both as part of her case in chief, since the court allowed exhibits to be entered up until closing argument, and as rebuttal of Dr. Goodman's testimony. The trial court refused to admit the documents because plaintiff could not produce Dr. Chambliss for examination immediately.

The jury awarded plaintiff $162,500 against Dr. Osimani, Dr. Zimmers and Resurrection Hospital for wrongful death, but it found in favor of Jewel on that charge. For Anthony's suffering before death, the jury found all defendants liable, and it assessed total damages at $1 million. The jury found that Anthony contributed 32.5%

of the negligence which caused those damages, and for the remaining $675,000 in damages, the jury apportioned 35% to Jewel, 20% to Dr. Zimmers and Resurrection Hospital, and 45% to Dr. Osimani. Plaintiff appealed and settled the claims against Dr. Osimani, Dr. Zimmers and Resurrection Hospital, leaving only the plaintiff and Jewel as parties to the appeal from the trial result.

Plaintiff asks this court to reverse and remand the judgment entered on the verdicts, on both the wrongful death and the survival claims, insofar as those verdicts pertain to Jewel. Plaintiff argues that the verdict in favor of Jewel on the wrongful death claim is contrary to the manifest weight of the evidence. (See *Barr v. Groll* (1991), 208 Ill. App. 3d 318, 322, 567 N.E.2d 13.) Both of plaintiff's experts and Dr. Osimani opined that salmonellosis was one cause contributing significantly to Anthony's death. Defendant's expert said only that he did not believe salmonellosis "contributed significantly" to the death; he never said that it did not in any way cause the death.

■ For the wrongful death claim, plaintiff had the burden of proving that Jewel's product caused Anthony's death. (*Owens v. Industrial Comm'n* (1990), 203 Ill. App. 3d 818, 822, 561 N.E.2d 147.) Plaintiff's experts explained that in their opinions the salmonellosis caused diarrhea and dehydration, and the dehydration caused the heart to work too hard, leading to the heart attack and death. The experts did not explain any other possible connection between the salmonellosis and the death. Defendants presented substantial evidence from defendant doctors and from experts, who said that Anthony was not dehydrated when he saw Dr. Osimani in May, or when he saw Dr. Zimmers on June 2, or when he died. Plaintiff's experts did not explain how salmonellosis could have contributed to the death without causing Anthony to be dehydrated. Therefore, the jury heard evidence which negated the only causal connection plaintiff attempted to establish. The jury's finding that plaintiff failed to meet her burden of proving the milk caused the death is not contrary to the manifest weight of the evidence.

■ Plaintiff next argues that the verdict finding Jewel not guilty of causing the death is inconsistent with the verdict holding Dr. Osimani liable for the death. While plaintiff presented substantial evidence that Dr. Osimani failed to properly diagnose and treat Anthony's dehydration, the jury could have rejected the evidence of dehydration and accepted defendants' evidence that Anthony was adequately hydrated. Plaintiff also presented evidence that when Anthony came to the emergency room on June 2 complaining of chest pain, Dr. Zimmers called Dr. Osimani and described the symptoms to him. The hospital sent the EKG showing an irregularity

indicative of ischemia to Dr. Osimani on June 3. Yet Dr. Osimani on June 2 did not authorize hospitalization for Anthony, and plaintiff's expert said that the standard of care required hospitalization at least long enough to perform further tests to determine the source of the chest pain and whether it could be related to the irregular EKG. Dr. Osimani did not call Anthony in for further testing after June 3, when he could have evaluated the EKG himself, in light of his close knowledge of Anthony's physical history. The jury could have found Dr. Osimani liable for Anthony's death on the basis of his failings on June 2 and thereafter, without relying in any way on Dr. Osimani's treatment of the salmonellosis or Anthony's alleged dehydration. Therefore, the verdict for Jewel on the wrongful death charge is not inconsistent with the verdict against Dr. Osimani on that charge.

Plaintiff contends that the trial court committed reversible error by excluding two pieces of evidence: the autopsy report and the diary. Plaintiff correctly asserts that the autopsy report was admissible without authentication testimony. (Ill. Rev. Stat. 1989, ch. 38, par. 115—5.1; see *People v. Campos* (1992), 227 Ill. App. 3d 434, 444, 592 N.E.2d 85; *Heitz v. Hogan* (1985), 134 Ill. App. 3d 352, 359, 480 N.E.2d 185.) The statute also grants all parties the right to examine the person who prepared the report, but it does not require such examination prior to admission. Ill. Rev. Stat. 1989, ch. 38, par. 115—5.1.

The trial court has discretion over the order of presentation of evidence (*Fedt v. Oak Lawn Lodge, Inc.* (1985), 132 Ill. App. 3d 1061, 1068, 478 N.E.2d 469), and it may exclude admissible evidence which the offering party should have presented earlier (see *Savitch v. Allman* (1977), 52 Ill. App. 3d 884, 888, 368 N.E.2d 224). Allowing a party to present admissible evidence may be error if the timing of presentation prejudices an opposing party. *Carlson v. New York Life Insurance Co.* (1966), 76 Ill. App. 2d 187, 222 N.E.2d 363; see *Fedt*, 132 Ill. App. 3d at 1068.

In *Carlson* the trial court allowed the plaintiff to interrupt his direct testimony to put on his expert witness at the expert's convenience. Plaintiff asked the expert hypotheticals based on plaintiff's expected testimony. Although the expert's opinion was admissible, the appellate court held that the trial court abused its discretion by allowing the evidence to be so presented at that time:

> "The defendant had been given no opportunity to cross-examine the plaintiff and was thereby restricted in presenting to the expert medical witness alternate assumed facts based upon plaintiff's testimony. The result of taking these particular witnesses out of order, was to deprive the defendant of the full right of cross-examination of the expert witness." *Carlson*, 76 Ill. App. 2d at 202.

Similarly, in *Fedt* this court observed that a trial court abuses its discretion in determining the order of presentation of evidence "if a party is denied an opportunity to impeach witnesses, to support the credibility of impeached witnesses, or to respond to new points raised by the opponent." *Fedt*, 132 Ill. App. 3d at 1068.

■ In this case plaintiff waited until both parties had rested before attempting to introduce the autopsy report, both as part of her case in chief and as rebuttal. Dr. Chambliss, who prepared the report, had been released from subpoena and, due to his scheduling difficulties, defendants could not examine him concerning the statements in the report without a substantial delay in the trial. The trial court offered to accept the evidence if plaintiff could present Dr. Chambliss for examination promptly. Since plaintiff could not do so, acceptance of the proffered evidence would have deprived defendants of their statutory right to examine the preparer. Therefore, although plaintiff had the right to present the autopsy report without authentication testimony, she needed to inform defendants of her intention to do so at a time when defendants would still be able to examine Dr. Chambliss. The court did not abuse its discretion by disallowing this admissible evidence as part of plaintiff's case in chief.

Neither was the report proper rebuttal evidence. As Jewel points out, rebuttal evidence must either disprove an affirmative defense or meet new points raised by defendant's evidence. (*Apicella v. Mace* (1977), 47 Ill. App. 3d 43, 47, 361 N.E.2d 756.) The decision to allow or deny rebuttal evidence is committed to the sound discretion of the trial court, and that decision will not be disturbed absent an abuse of discretion. (*Hall v. Northwestern University Medical Clinics* (1987), 152 Ill. App. 3d 716, 721, 504 N.E.2d 781.) Proof that salmonellosis caused Anthony's death formed the basis of plaintiff's claim against Jewel; Jewel's expert's contrary opinion did not constitute a new issue raised by defendant. The trial court did not abuse its discretion by disallowing the report as rebuttal.

Finally, plaintiff argues that the trial court erred by excluding those portions of the Affatatos' diary which concerned Anthony's contact with doctors and what the doctors said to him. These passages, except for the excerpt from May 28, which Anthony wrote in the diary, involve triple hearsay. The doctor said something to Anthony, Anthony told plaintiff what the doctor said, and plaintiff wrote in the diary an account of what Anthony told her. The request for admission of this part of the diary involves three separate matters asserted: the substance of what the doctor told Anthony, the fact that the doctors said that to him, which is the substance of Anthony's statements to plaintiff, and the fact that Anthony told plaintiff that

the doctors made such statements, which is the substance of plaintiff's diary entries.

Under the state of mind exception to hearsay, if he had been available Anthony could have testified that doctors made certain statements to him. Where a plaintiff is charged with contributory negligence, the plaintiff may present evidence which shows that his conduct conformed to the objective standard of acting with ordinary prudence under the circumstances. (*Martin v. Hertz Corp.* (1982), 104 Ill. App. 3d 592, 594, 432 N.E.2d 1262; see W. Keeton, Prosser & Keeton on Torts § 65, at 453 (5th ed. 1984).) Here, if doctors told Anthony that there was nothing they could do for him, or if Dr. Zimmers told him that the medicine he gave him for chest pain would not take all the pain away, the jury could find that Anthony's failure to see his doctors more often, and his failure to report continuing chest pains to his doctor after June 2, did not amount to contributory negligence. The circumstance of the doctors making such statements to Anthony affects the determination of Anthony's negligence regardless of the truth of the doctors' statements. Therefore, Anthony could present such testimony regarding out-of-court statements, because they would not be offered to show the truth of the matter asserted, but rather to show the effect that such statements had on Anthony's decisions. See *Hackett v. Ashley* (1979), 71 Ill. App. 3d 179, 186-87, 389 N.E.2d 246.

■ Anthony's death prevented him from testifying. Instead, plaintiff sought to introduce, through the diary, Anthony's out-of-court statements to plaintiff. Anthony's death is not in itself sufficient to render the statements admissible. (*Tarshes v. Lake Shore Harley Davidson* (1988), 171 Ill. App. 3d 143, 153, 524 N.E.2d 1136.) Plaintiff does not seek to prove the truth of the matters the doctors asserted in their statements to Anthony; that is, plaintiff does not seek to show that there was nothing the doctors could do to help Anthony, nor does she seek to use the doctors' statements to prove that Anthony continued to suffer chest pain after he took the medicine for gas. She intends to use the diary to prove only the fact that the doctors said these things to Anthony. This is exactly the matter asserted in Anthony's out-of-court statements to plaintiff, and therefore those statements constitute hearsay. While plaintiff had personal knowledge about the entries she made and that Anthony made those statements to her, she cannot use that evidence to prove the truth of Anthony's assertions that the doctors made those statements to him. Anthony's state of mind as reflected in his out-of-court statements is irrelevant to the contributory negligence defense: if Anthony believed doctors had made those statements, when they

had not, his erroneous belief could not bring his actions into accord with the objective standard of reasonable care required to avoid a charge of contributory negligence. Only the fact that the doctors made such statements could help plaintiff, and that is the substance of Anthony's statements to her. Thus, the diary entries concerning what doctors said to Anthony, and what Anthony said he did in response, are hearsay, not within any exception. The trial court committed no error by excluding the statements from evidence.

Since the trial court committed no error or abuse of discretion in ruling on the evidence, and since the jury verdicts are neither contrary to the manifest weight of the evidence nor inconsistent, we affirm the judgment for Jewel on the wrongful death claim and the judgment for plaintiff on the claim for Anthony's suffering prior to his death.

## II

Shortly after plaintiff arrived at work on June 10, 1985, she received a call from her son, who told her he could not wake Anthony up. Plaintiff called 911 at 8:35 a.m. and went home. Paramedics Michael Sassana and Kevin O'Shea promptly left for plaintiff's home at 7446 West Rosedale. When plaintiff arrived at 8:45 a.m. she met Jim Warren, a neighbor, running to her house. Warren administered CPR on Anthony while plaintiff again called 911. The paramedics, who had gotten lost en route, finally arrived at 9 a.m. They attempted to revive Anthony for about 30 minutes, then they transported him to Resurrection Hospital, where doctors pronounced him dead.

Plaintiff sued the City of Chicago (the City) for willful and wanton misconduct which caused Anthony's death. She alleged that the City responded late to the emergency call, failed to train or require paramedics to determine the location of a call before setting out, failed to require dispatchers to give, and paramedic crews to request, directions for calls, failed to require paramedics to carry maps, failed to test paramedics for knowledge of Chicago city streets, and failed to promulgate rules assuring speedy responses, all with knowledge that such failures would cause life-threatening delays in responding to emergencies.

The City moved for summary judgment, arguing that the depositions showed that plaintiff could not prove proximate cause or willful and wanton misconduct. Plaintiff presented the depositions of the paramedics in opposition to the motion. O'Shea testified that the City gave him no instruction concerning how to locate a call. He could not recall any other instance in his seven years as a paramedic in which he or any other paramedic had difficulty locating a call. On June 10, 1985, Sassana carried a street guide, which was an alphabetical list

of Chicago streets matched with the coordinates of the street. The guide listed Rosedale at 5900 north. When he and Sassana reached 6000 north without finding Rosedale, they returned south more than a block, again without success. They pulled over and radioed for directions, which the dispatcher gave them. According to O'Shea's records, they arrived about 20 minutes after leaving the station.

Sassana corroborated O'Shea's testimony. He, too, could not recall any other time in his nine years as a paramedic that he needed the dispatcher's help to locate an address.

The trial court granted the City's motion for summary judgment, finding that plaintiff had not presented evidence of willful and wanton misconduct.

Plaintiff concedes that the Emergency Medical Services (EMS) Systems Act (Ill. Rev. Stat. 1985, ch. 111$^1$/$_2$, par. 5501 *et seq.*) gives the City immunity from prosecution in this case for ordinary negligence. The Act provides:

"Any person, agency or governmental body *** who in good faith provides life support services *** in an emergency shall not be liable as a result of their acts or omissions in providing such services unless such acts or omissions *** constitute willful or wanton misconduct." Ill. Rev. Stat. 1985, ch. 111$^1$/$_2$, par. 5517(a).

An act is willful or wanton if it is intentional or if it is

"committed under circumstances exhibiting a reckless disregard for the safety of others, such as a failure, after knowledge of impending danger, to exercise ordinary care to prevent it or a failure to discover the danger through recklessness, or carelessness when it could have been discovered by ordinary care." *O'Brien v. Township High School District 214* (1980), 83 Ill. 2d 462, 469, 415 N.E.2d 1015.

Plaintiff does not contend that the City intended to harm Anthony. She claims that the paramedics wilfully responded late to the emergency call. In their depositions the paramedics said they immediately got into the ambulance and took off in the right direction when they received the call. When they came near plaintiff's street they checked the street guide and found the coordinates for Rosedale. They passed that number twice before they determined that Rosedale did not intersect the street they were on, and then they called the dispatcher for directions. They then proceeded directly to plaintiff's home. Plaintiff has no complaint concerning the treatment they gave Anthony at her home. Plaintiff presented no evidence contrary to the depositions. The paramedics apparently made a good-faith effort to aid Anthony. Plaintiff presented no evidence from which a trier of fact could conclude that the paramedics showed a "reckless disregard" for, or conscious indifference to, Anthony's safety. *O'Brien*, 83

Ill. 2d at 469; see *Ingram v. Little Co. of Mary Hospital* (1982), 108 Ill. App. 3d 456, 459, 438 N.E.2d 1194.

Similarly, plaintiff failed to present evidence of corporate acts which amounted to willful and wanton misconduct. Plaintiff alleged that the City failed to require rescue crews to carry maps and it did not require dispatchers to give directions. Unless plaintiff presented evidence that the City knew these failings imperiled people, or that the City failed to know this danger only through recklessness, plaintiff could not prove willful or wanton misconduct under the definition in *O'Brien*. The paramedics presented the only evidence of the City's knowledge of this peril. O'Shea said that in his seven years as a paramedic, he knew of no other instance in which the paramedic crew had difficulty locating a call. Sassana swore that in his nine years as a paramedic, he knew of no other such instance. Without evidence that the City knew of the dangers wrought by failing to provide maps or give specific directions for each call, plaintiff cannot show that the City's acts were reckless or conscious. Plaintiff did not present sufficient evidence to support a finding that the City committed more than ordinary negligence, and therefore the trial court properly granted the motion for summary judgment.

For the reasons stated above, the judgment of the trial court in favor of the City is affirmed, as are the judgments for plaintiff for Anthony's suffering and for Jewel in the wrongful death action.

Affirmed.

DiVITO, P.J., and HARTMAN, J., concur.